IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
---

JER CREATIVE FOOD CONCEPTS, INC.,

                Plaintiff,            OPINION AND ORDER

v.

                                       23-cv-115-wmc

CREATE A PACK FOODS, INC.,

                Defendant.
---

      This case arises out of a failed business relationship between plaintiff JER Creative Food Concepts, Inc., which does business as Golden Select Foods ("Golden"), and defendant Create A Pack Foods, Inc. ("CAP"). Golden filed suit for breach of contract, alleging that CAP failed to honor their pricing and production agreement; it also sought a declaratory judgment that Golden was under duress when it released any claims against CAP. (Dkt. #1, at 10.) CAP then counterclaimed for breach of contract, alleging that Golden failed to pay for goods worth $51,882. (Dkt. #5, at 7.)

      Before the court is CAP's motion for summary judgment, arguing that Golden's contract claim is barred by the statute of frauds, as well as the claims release Golden freely signed. (Dkt. #10.) CAP further argues that it is entitled to payment for the goods it sent Golden as a matter of law. For the reasons that follow, the court will grant CAP's motion in full.[1]

---
[1] As a result, the court will also deny Golden's motion to amend the pretrial conference order (dkt. #26) as moot.

UNDISPUTED FACTS[2]

Plaintiff Golden is a California-based kosher food company. Golden does not itself manufacture food based on any proprietary formulas, but rather it contracts with "co-packers," who cook, package, warehouse, and ship Golden's products using formulas, ingredients, and equipment provided by Golden. Golden's president, Jonathan Freed, is responsible for the company's product development, sales, and administration. Defendant CAP is a manufacturer and packager of food products based in Ixonia, Wisconsin, and led by its president, Glenn Cochrane.

In late 2014, Golden and CAP began negotiations for CAP to manufacture, package, and store Golden's products at CAP's facility in Ixonia for delivery to Golden's customers. In December of 2014, Golden's president Freed sent CAP's president Cochrane an eight-year, co-packing agreement with proposed pricing terms. On January 19, 2015, Cochrane emailed a lightly revised copy of the packing agreement back to Freed, highlighting several areas that he felt required additional clarification. Although he did not sign the marked-up agreement for CAP, Cochrane later confirmed having sent "the contract" to Golden after Freed inquired about receipt of a completed packing agreement. (Dkt. #23, at 4.) In reliance, Golden then paid for the build-out and installation of its equipment at CAP's facilities.

Even so, CAP maintains -- and Golden disputes -- it also informed Golden that it would not sign the packing agreement until evaluating how well actual production

---

[2] Unless otherwise indicated, the following facts are material and undisputed, considering the parties' proposed factual findings, responses, and evidence of record in a light most favorable to plaintiff as the non-moving party. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

corresponded with Golden's representations regarding timelines and yields. (Dkt. #22, at 3 and Dkt. #23, at 4.) Similarly, the parties dispute whether CAP informed Golden that it would only process and package Golden's food products on a per-order basis, although the parties agree CAP informed Golden that the price charged to produce Golden's products would necessarily fluctuate based on the cost of raw materials, shipping, energy, and other market factors. Still, Golden contends that CAP did not even attempt to alter the pricing terms of the packing agreement until April of 2020. (Dkt. #23, at 8.) At that point, however, the parties agree that CAP refused to accept any new orders unless Golden agreed to CAP's new, proposed pricing.

In October of 2021, CAP also notified Golden that it intended to close the plant where Golden's products were produced, requiring Golden to remove its equipment by June 1, 2022. On February 27, 2022, CAP further informed Golden that it would not accept any additional orders from Golden. Two weeks later, however, CAP and Golden signed a "Transition Agreement," in which CAP agreed to continue manufacturing Golden's food products through May 27, 2022, and Golden agreed to a number of terms and conditions, including a release of any claims it had against CAP before the date the Transition Agreement was signed -- March 11, 2022.

After signing the Transition Agreement, Golden subsequently placed a larger-than-normal order with CAP in order to assure it could continue supplying Golden's customers until an alternative co-packer could be found. In keeping with that order, CAP then delivered $52,507 worth of "finished product and inventory" to Golden between June 8 and June 16, 2022. (Dkt. #22, at 6.) Although Golden accepted those goods and paid

3

$625 towards its account with CAP, the remaining $51,882 invoiced to Golden remains outstanding. Golden has since refused to make any further payments to CAP.

OPINION

At summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017). Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If the moving party meets this burden, then to survive summary judgment, the non-moving party must provide evidence "on which the jury could reasonably find for the nonmoving party." *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 406-407 (7th Cir. 2009), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Here, plaintiff claims that defendant breached their original contract -- in particular, its pricing terms -- and seeks a declaratory judgment that its release of claims under the Transition Agreement was obtained under duress and, therefore, is unenforceable. Defendant now seeks summary judgment in its favor on all claims, including its counterclaim for breach of contract arising from plaintiff's failure to pay for goods received in June of 2022. The court will address plaintiff's claims before turning to defendant's counterclaim.

I. **Plaintiff's Claims**

To state a claim for breach of contract under Wisconsin law, a claimant must prove: "(1) the existence of a contract creating obligations flowing from defendant to plaintiff; (2) a breach of those obligations; and (3) damages from the breach." *Uebelacker v. Paula*

4

*Allen Holdings, Inc.*, 464 F. Supp. 2d 791, 801 (W.D. Wis. 2006) (citing *Northwestern Motor Car, Inc. v. Pope*, 51 Wis. 2d 292, 187 N.W.2d 200, 203 (1971)).  Invoking Wisconsin's *common law* statute of frauds, defendant contends that the parties never had an enforceable contract, and that in any event, plaintiff released any claims it had against defendant in the March 2022 Transition Agreement.  Plaintiff -- relying on a case interpreting the statute of frauds provision in the *Uniform Commercial Code* ("UCC") as codified in Illinois -- contends that the packing agreement did not require defendant's handwritten signature to form a binding contract and further argues that it signed the Transition Agreement under duress.[3]  The court will address the enforceability of the parties' original contract and Transition Agreement, then turn to plaintiff's claim of duress.

   A.  **Breach of Contract**

To determine which statute of frauds is relevant here, the court must first decide whether the packing agreement is one for goods, such that Article 2 of the UCC applies, or one for services, which would be governed by Wisconsin common law.  The parties largely assume that the common law applies here; notably, defendant only challenges the possibility that the agreement between the parties is governed by the UCC in a single footnote in its reply.  (Dkt. #20, at 2.)  Yet in its counterclaim, defendant relies on

---

[3] The unsigned packing agreement contains a choice of law provision requiring that it be governed by California law.  Even if enforceable, however, a party can waive a choice of law argument by failing to assert it.  Since neither party raises the choice of law issue, the court will apply the forum state's substantive law.  *Orgone Capital III, LLC v. Daubenspeck*, 912 F.3d 1039, 1044 (7th Cir. 2019); *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014).  Similarly, while the unsigned packing agreement requires any disputes arising out of it be submitted to arbitration, "a party that chooses a judicial forum for the resolution of a dispute is presumed to have waived its right to arbitrate."  *Sharif v. Wellness Int'l Network, Ltd.*, 376 F.3d 720, 726 (7th Cir. 2004) (citation omitted).  Since neither party has sought arbitration, the court proceeds to the merits.

Wisconsin's codification of the UCC to seek recovery of nearly $52,000 "for the goods delivered" to plaintiff.  (*Id*. at 6 (citing Wis. Stat. §§ 402.607(1) and 402.709(1)(a)).)  Regardless, the court is not required to accept the parties' apparent agreement on an incorrect proposition of law in contravention of the proper standard.  *Twohy v. First Nat'l Bank of Chicago*, 758 F.2d 1185, 1190 (7th Cir. 1985).  Moreover, defendant may well be judicially estopped from taking clearly inconsistent legal positions at different stages of litigation in order to take unfair advantage of "a forum designed for suitors seeking justice." *In re Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990) (citation omitted).

"Interpreting . . . whether [a contract] is primarily one for goods or primarily one for services -- presents a question of law[.]"  *Linden v. Cascade Stone Co.*, 2005 WI 113, ¶ 5, 283 Wis. 2d 606, 699 N.W.2d 189 (citing *Ins. Co. of N. Am. v. Cease Elec. Inc.*, 2004 WI 139, ¶ 14, 276 Wis. 2d 361, 688 N.W.2d 462).  To determine whether a contract between two parties is one for services or goods, the court must apply the so-called "predominant purpose test," considering objective and subjective factors such as "the amount charged for services and the amount charged for materials, whether the purpose or 'thrust' of the contract was for goods or for services[,] and the language used in the contract to describe the project."  *Trinity Lutheran Church v. Dorschner Excavating, Inc.*, 2006 WI App 22, ¶ 22, 289 Wis. 2d 252, 710 N.W.2d 680 (quoting *Linden*, 2005 WI 113 at ¶ 20).  Thus, the predominant purpose test requires this court to examine the "totality of the circumstances."  *Id*. (quoting *Linden*, 2005 WI 113 at ¶¶ 22, 32).

Under the UCC, goods are defined as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale[.]" Wis. Stat. § 402.105(1)(c).  Even if the packing agreement between the parties

6

contemplated that defendant would perform a service by manufacturing and storing plaintiff's product, the essential purpose of the agreement was the sale of goods: specifically, kosher foodstuffs that defendant manufactured and plaintiff sold to its clients. *See Aliki Foods, LLC v. Otter Valley Foods, Inc.*, 726 F. Supp. 2d 159, 169 (D. Conn. 2010) (contract between food company and food manufacturer one for goods); *Toasted Oat, Inc. v. Snackwerks of Michigan, LLC*, No. 21-cv-374, 2022 WL 1552215, at *4-6 (W.D. Mich. May 17, 2022) (same). That conclusion follows from the language of the draft packing agreement, which required defendant to manufacture "Product" in quantities to be determined by purchase orders -- and only incidentally to "perform all necessary services requested" by plaintiff -- as well as from defendant's own characterization of the "goods" it sold plaintiff for which it now seeks payment. (Dkt. #1-1, at 1 and Dkt. #5, at 7.)

Because the UCC applies to the contract between the parties in this case, the next question the court must address is whether that contract is, in fact, enforceable. Under Wisconsin's codification of the UCC, the statute of frauds provides that "a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties[.]" Wis. Stat. § 402.201(1). However, since "not every contract for the sale of goods over $500, nor every modification thereof, strictly complies with the requirements of the statute of frauds . . . it would be unreasonable to declare categorically all such contracts unenforceable." *Royster-Clark, Inc. v. Olsen's Mill, Inc.*, 2006 WI 46, ¶ 19, 290 Wis. 2d 264, 714 N.W.2d 530. As a result, Wisconsin law recognizes several exceptions that take a contract for goods outside the statute of frauds.

7

Plaintiff appears to suggest that the so-called "merchant exception" would allow the statute of frauds' signature requirement to be satisfied by an email. (Dkt. #15, at 6 (citing *Cloud Corp. v. Hasbro, Inc.*, 314 F.3d 289 (7th Cir. 2002)).) This exception provides that a writing confirming a contract between merchants can satisfy the statute of frauds when sent within a reasonable time. Wis. Stat. § 402.201(2). To begin, the contract in question here is certainly one between merchants. *See* Wis. Stat. § 402.104(3) (defining a merchant as one who "deals in goods of the kind" or holds herself out "as having knowledge or skill peculiar to the practices or goods involved in the transaction"). However, the parties disagree on whether defendant's president, Cochrane, intended to confirm or disavow the packing agreement in his emails sent on January 19, 2015. (Dkt. #22, at 3 and Dkt. #23, at 5.) Any dispute as to the intent of the parties to contract ordinarily presents an issue of fact that precludes summary judgment. *Peninsular Carpets, Inc. v. Bradley Homes, Inc.*, 58 Wis. 2d 405, 206 N.W.2d 408, 412 (1973); 10B Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 2730.1 (4th ed. 2023) (summary judgment is "inappropriate" where "there is a factual dispute regarding the existence of a valid and binding agreement"). Similarly, given Cochrane's having altered the contract before returning it, a factual dispute would appear as to whether there was a "meeting of the minds" as to that contract's essential terms, as well as what modifications occurred by agreement, custom or practice over the approximately seven years the original contract was arguably in effect. *Taizhou Yuanda Inv. Grp., Ltd. v. Z Outdoor Living, LLC*, 522 F. Supp. 3d 476, 482-83 (W.D. Wis. 2021) (citing *Carnes Co. v. Stone Creek Mech., Inc.*, 412 F.3d 845, 853 (7th Cir. 2005)) (applying Wisconsin law). Finally, even if unenforceable, the parties plainly operated

8

under an exchange of separate, written invoices and acceptance. *Twin Disc, Inc. v. Big Bud Tractor, Inc.*, 772 F.2d 1329, 1334-35 (7th Cir. 1985) (same).

Whatever the enforceability and terms of the parties' original, contractual relationship, however, defendant would still be entitled to summary judgment on plaintiff's breach of contract claim if plaintiff's release of claims provision in the Transition Agreement is valid. Under Wisconsin law, when the language of a release is clear on its face, a court must assume that the language represents the parties' intent and apply that language as written. *United States v. Ettrick Wood Prods., Inc.*, 916 F.2d 1211, 1219 (7th Cir. 1990). The language in the Transition Agreement here is clear: plaintiff agreed to release defendant from "any and all liability and responsibility for losses and damages relating to or arising from" defendant's "manufacture of product or the providing of services" before March 11, 2022. (Dkt. #13-1, at 2.) Accordingly, summary judgment must be entered in defendant's favor on plaintiff's breach of contract claim unless the court finds that agreement invalid.[4] Since plaintiff raises a single defense to the Transition Agreement's enforceability, the court turns to its claim of economic duress next.

**B. Economic Duress Defense**

In his response and affidavit, plaintiff's president, Freed, represents that he signed the Transition Agreement under duress, which was "necessary to Golden's survival . . . so it could continue to have orders filled by CAP" and "avoid the absolute destruction of

---

[4] Plaintiff has been unable to produce any evidence of damages to date, citing a variety of staffing and timing issues. (Dkts. ##24-28.) Although plaintiff has moved for additional time to compile those records (dkt. #26), the court's conclusion regarding the enforceability of the Transition Agreement renders moot any issues regarding plaintiff's damages.

Golden's business." (Pl's Resp. (dkt. #15) 7; Freed Aff. (dkt. #16) ¶ 30.) Plaintiff further points to its need "on short notice to find another arrangement for the production of its product" after defendant decided to close the plant containing plaintiff's equipment. (Dkt. #15, at 7.)

Economic duress is a contractual defense that allows a party to void a contract when it was induced by an improper threat. Restatement (Second) of Contracts § 175(1). "Duress involves wrongful acts . . . that compel a person to manifest apparent assent to a transaction without his volition or cause such fear as to preclude him from exercising free will and judgment in entering into a transaction." *Wurtz v. Fleischman*, 97 Wis. 2d 100, 293 N.W.2d 155, 160 (1980) (internal citation and quotation marks omitted). To prove economic duress, plaintiff must show that: (1) "he has been the victim of a wrongful or unlawful act or threat"; (2) "[s]uch act or threat must be one which deprives the victim of his unfettered will"; and (3) as a result of the first two elements, "the party threatened must be compelled to make a disproportionate exchange of values or to give up something for nothing." *Id*.

Unfortunately, plaintiff has failed to put forth sufficient evidence of economic duress from which a reasonable jury could conclude that CAP acted wrongfully or threatened Golden to induce it to sign the Transition Agreement. Freed's affidavit certainly supports a finding that defendant required plaintiff to sign the Transition Agreement in order for plaintiff to obtain the necessary amounts of product needed to supply its customers during the contemplated transition period to a new co-packer, but "threats to do what the threatening person has a legal right to do, do not constitute duress." *Wurtz*, 293 N.W.2d at 160; *see also Pope v. Ziegler*, 127 Wis. 2d 56, 377 N.W.2d 201, 203

(Ct. App. 1985) ("A threat to do what the person making the threat has a legal right to do does not constitute duress; nor does driving a hard bargain or taking advantage of another's financial difficulty.").

As for the second element, plaintiff has also failed to put forth evidence from which a reasonable jury could conclude that defendant's actions deprived the company of its "unfettered will." *Wurtz*, 293 N.W.2d at 160. Even if Freed pushed back on the language releasing Golden's claims against CAP and initially objected to signing the Transition Agreement altogether, the record lacks any evidence to suggest that Freed was not communicating willingly with CAP. Plaintiff's own complaint cites an email where Freed acknowledged that he was "reluctantly signing the agreement" in order to "save [his] business." (Dkt. #1, at ¶ 46.) However, plaintiff had other reasonable courses of action at that point, including pursuing legal action to enforce the terms of the packing agreement. Although economic duress might exist where the legal remedies for a party's threatened breach of contract are inadequate, plaintiff's financial difficulties alone did not deprive it of the choice to sign the Transition Agreement. *Prof'l Serv. Network, Inc. v. American Alliance Holding Co.*, 238 F.3d 897, 900-01 (7th Cir. 2001) (applying Wisconsin law); *Selmer Co. v. Blakeslee-Midwest Co.*, 704 F.2d 924, 927 (7th Cir. 1983) (same).

Finally, and most importantly, this defense fails because plaintiff has not come forward with sufficient evidence that it was "compelled to make a disproportionate exchange of values or to give up something for nothing." *Wurtz*, 293 N.W.2d at 160. Again, by signing the Transition Agreement, defendant agreed to continue providing plaintiff with its products for two more months, which would allow plaintiff to stockpile the necessary amounts it needed to supply customers while it searched for a new co-packer.

While plaintiff's president asserts in conclusory terms that he had no choice, *no* underlying evidence would support a reasonable jury concluding the same, including what the company's overall financial strength was. Certainly, a jury could find Golden was facing loss of goodwill from some of its customers if their orders went unfulfilled for some period. However, that is a far cry from proof that its very economic survival was at stake. *Prof'l Serv. Network*, 238 F.3d at 900-01 (contrasting actual economic duress in *Alaska Packers' Ass'n v. Domenico*, 117 F. 99 (9th Cir. 1902), where "[t]he captain had acted under duress in agreeing to the modification because, had he not agreed, the fishing season would have been ruined, since the strikers had an effective albeit temporary monopoly of the labor supply necessary to continue with the fishing and it would not have been feasible to sue them as a means of recouping the loss.").

For all these reasons, the court concludes that the undisputed record forecloses a reasonable jury from finding economic duress. Accordingly, because the Transition Agreement's release is valid, defendant is entitled to summary judgment on plaintiff's breach of contract *and* declaratory judgment claims.[5]

## II. Defendant's Counterclaim

The final matter remaining before the court is defendant's counterclaim seeking payment from plaintiff. The material facts underlying defendant's counterclaim are undisputed: (1) defendant delivered $52,507 worth of finished product and inventory to plaintiff in June of 2022; (2) plaintiff accepted the finished product and inventory;

---

[5] Due to the court's ruling on the Transition Agreement's validity, whether the UCC or Wisconsin common law applies to plaintiff's breach of contract claim is not determinative of the outcome here.

12

(3) plaintiff only paid $625 for them; and (4) plaintiff has failed to pay the remaining balance due of $51,882 as invoiced. (Dkt. #22, at 6.)

As discussed above, the UCC applies to defendant's counterclaim as well. In support of its entitlement to payment, defendant cites Wis. Stat. § 402.607(1) ("[t]he buyer must pay at the contract rate for any goods accepted") and § 402.709(1)(a) ("[w]hen the buyer fails to pay the price as it becomes due the seller may recover . . . the price of goods accepted"). Unless generously reading its duress defense to apply here, plaintiff's failure to provide *any* argument in response to defendant's counterclaim at summary judgment constitutes waiver. *Nichols v. Michigan City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

Regardless, defendant is plainly entitled to summary judgment on its counterclaim under Wis. Stat. §§ 402.607(1) and 402.709(1)(a) for the costs of goods sold. As a result, plaintiff is liable to defendant for the $51,882 it owes defendant, in addition to 5% annual prejudgment statutory interest ($216.18/month) beginning on July 16, 2022 -- 30 days after the date of the final, unpaid invoice -- under Wis. Stat. § 138.04. *Murray v. Holiday Rambler, Inc.*, 83 Wis. 2d 406, 265 N.W.2d 513, 529 (1978); *Ma v. Cmty. Bank*, 686 F.2d 459, 465 (7th Cir. 1982). As of today, those monthly interest charges total $4,539.78. Although defendant has not pointed to any fee-shifting provision in the relevant

13

agreements that would entitle it to attorney's fees in this litigation, it may also recover any costs permitted by Fed. R. Civ. P. 54(d)(1).[6]

ORDER

IT IS ORDERED that:

1) Defendant Create A Pack Foods' Motion for Summary Judgment (dkt. #10) is GRANTED;

2) Plaintiff JER Creative Food Concepts, Inc., shall pay defendant $56,421.78;

3) Plaintiff's motion to amend the preliminary pretrial conference order (dkt. #26) is DENIED as moot; and

4) The clerk of court is directed to enter judgment accordingly and close this case.

Entered this 7th day of May, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[6] Had the parties taken this dispute to arbitration, as contemplated by the packing agreement, defendant may have been entitled to attorney's fees upon a favorable arbitral decision. (Dkt. #1-1, at 10-11.) However, by placing the validity of the packing agreement in question and waiving its right to arbitrate, defendant elected -- intentionally or unintentionally -- to forego that entitlement.

14